257 F.2d 22
 Oscar GUEST, as Administrator of the Estate of Callie W.
Beane, deceased, Appellant,
v.
Dr. C. S. BREEDIN and St. Mary's Hospital and Training
School for Nurses, a corporation, Appellees.
 No. 7632.
 United States Court of Appeals Fourth Circuit.
 Argued June 5, 1958.
Decided July 16, 1958.
 
 Henry Hammer and Henry H. Edens, Columbia, S.C. (G. Ross Anderson, Jr., Anderson S.C., on brief), for appellant.
 William L. Watkins and John K. Hood, Jr., Anderson, S.C. (Earle M. Rice, Anderson, S.C., on brief), for appellees.
 Before SOBELOFF, Chief Judge, SOPER, Circuit Judge, and MOORE, District judge.
 SOBELOFF, Chief Judge.
 
 
 1
 This is a suit for malpractice against a physician. The administrator of Callie W. Beane obtained a favorable verdict from the jury for injuries which allegedly caused the decedent's death. The appeal is from an order of the District Judge granting the defendant's motion for judgment n.o.v. or, in the alternative, a new trial.
 
 
 2
 Beane died while on the operating table of a private hospital managed by the defendant, Dr. C. S. Breedin, and owned by his wife. A post mortem examination revealed that the decedent's spinal cord had been crushed in the fracture of a vertebra. The question chiefly in dispute is whether the fracture occurred before death and caused the death, as the plaintiff claims, or whether Beane died naturally of 'heart arrest' and the fracture occurred after death, in the mortuary, as claimed by the defendant.
 
 
 3
 The decedent, 57 years old, had for ten years suffered from osteoarthritis. The disease had progressed so far that his spine was curved almost to a half circle and wryneck drew his head down to the left. He entered the hospital for treatment by the defendant, and after a two-week stay was taken to the operating room on January 17, 1955. The defendant testified that he wanted to examine the patient's neck muscles in a relaxed state to determine whether surgery, to relieve the wryneck, 'was justifiable under the circumstances,' and, if justifiable, an operation was to be performed on the spot. Anesthesia was preferable because examination would be painful.
 
 
 4
 Beane himself 'slid' from the stretcher on which he was wheeled into the operating room to the operating table. Anesthesia, sodium pentathol, was administered. The defendant and the nurses present at the operation testified that he manipulated Beane's neck 'gently.' One of them, however, said that while the doctor was manipulating the patient's head and neck, Beane 'sort of raised his knees' against the strap holding his legs to the table; he 'rared his legs against that strap.' After approximately 45 minutes to one hour of examination, Dr. Breedin, according to the defense witnesses, announced that 'it would be too big an operation to do at that stage,' and immediately thereafter Beane's pulse 'disappeared suddenly.' Stimulants failed to revive him, and he died about 11:30 a.m.
 
 
 5
 At 1:30 p.m. the body was removed to the mortuary. Douglas McDougald, funeral director, testified that neither he, nor anyone pursuant to instructions from him, performed any act of violence on it. Beane's face was shaved by Charles Bannister, who embalmed the body. The embalming process involves pumping a fluid through an artery, displacing the blood through an opening made in a vein.
 
 
 6
 When Beane's brother-in-law came to the mortuary about 5 p.m. that afternoon, however, McDougald moved a pillow under the decedent's head, and the head moved. The brother-in-law found that it could be moved from side to side. The defendant suggests that in the process of adjustment, the neck was broken, but Bannister, like McDougald, denies this. Bannister testified that the body was shaped like a see-saw, and to fit it into the casket it was 'adjusted' by leveling the legs and head to equal heights, with supports under them. If the neck had been broken before Bannister handled the body, he did not notice it.
 
 
 7
 The next day a pathologist and a radiologist performed an autopsy. They found that the third cervical vertebra was fractured and that this had crushed the spinal cord. There was also evidence of hemorrhage in the area, and, from its character and extent, their positive testimony was that the spinal cord was crushed before death and that this was the cause of death.
 
 
 8
 The plaintiff's medical experts also testified that it would have taken considerable pressure to break the neck bones. Breedin admitted that the application of sufficient pressure to break the neck would, under the circumstances, have been 'gross negligence' and 'contrary to all standards of medical treatment.' He also admitted that Beane's bones were not abnormally chalky or brittle. His insistence, however, was that he applied no excessive pressure; tht Beane must have died from a 'heart arrest' or an 'angina,' which would not show in the autopsy; that, because of the curve in Beane's spine, he would have sat eleven inches out of the casket, so that the people at the mortuary must have broken Beane's vertebra trying to 'adjust' him. It was the doctor's further suggestion that the hemorrhage must have been caused by the force of the embalming fluid. The pathologist and the radiologist negatived this suggestion; they testified that what they found in the autopsy could have been caused only by the action of the heart and not after death in the embalming process.
 
 
 9
 This conflict, the jury, in the performance of their undoubted function, resolved by rendering a verdict for the plaintiff for $20,000. The Judge granted the defendant's motion for judgment n.o.v., or, in the alternative, a new trial. See, Montgomery Ward & Co. v. Duncan, 1940, 311 U.S. 243, 61 S.Ct. 189, 85 L.Ed. 147. Essentially the bases for the motion in the alternative, though stated jointly, were in fact separate. The ground for the motion for judgment n.o.v. was that there was no competent evidence as to the defendant's negligence sufficient to go to the jury, while the motion for a new trial rested on the contention that the verdict was against the weight of the evidence.
 
 
 10
 The above recital of the testimony, we think, shows an adequate basis for submission of the issues to the jury. See: 41 Am.Jur., 'Physicians and Surgeons,' Sec. 79, p. 198; Smith v. Baker, 1934, 172 S.C. 75, 172 S.E. 767; Bessinger v. De Loach, 1956, 230 S.C. 1, 94 S.E.2d 3; Cf.: Thomas v. Register, 1918, 110 S.C. 173, 96 S.E. 517; Dillishaw v. Bell, 1920, 115 S.C. 258, 105 S.E. 410; Green v. Shaw, 1926, 136 S.C. 56, 134 S.E. 226, 48 A.L.R. 243. The judgment n.o.v. should not have been extended. We are not prepared to say, however, that the District Judge exceeded the limits of judicial discretion in relying upon his appraisal of the weight of the evidence in granting the alternative motion for a new trial. United States v. Socony-Vacuum Oil Co., 1940, 310 U.S. 150, 247, 60 S.Ct. 811, 84 L.Ed. 1129; Norfolk Southern Ry. Co. v. Davis Frozen Foods, 4 Cir., 1952, 195 F.2d 662.
 
 
 11
 Reversed and remanded for new trial.